## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MAX ORTEGA III,

       Plaintiff,

v.                                  No. CIV 21-0728 RB/JHR

WILLIAM EDGMAN, LOUISE LOPEZ,
NEW MEXICO CORRECTIONS
DEPARTMENT, and DOES (1–50),[1]

       Defendants.

### MEMORANDUM OPINION AND ORDER

While Plaintiff Max Ortega III was awaiting trial on a criminal charge, a state court district judge placed him into the custody of the New Mexico Corrections Department (NMCD) on a "safekeeping" order pursuant to N.M. Stat. Ann. § 33-3-15. According to NMCD policy, Ortega was housed in a "Restrictive Housing Unit" (RHU), a unit akin to solitary confinement. Ortega was kept in the RHU for almost a year without having his placement reviewed.

Ortega filed a lawsuit in state court bringing four state claims against Defendants Luis Lopez,[2] the NMCD, and John Doe guards. Lopez and the NMCD moved to dismiss, and the state court granted the motion, dismissing the four claims with prejudice but allowing Ortega to file an amended complaint. Ortega filed a First Amended Complaint, bringing the same four state law claims and adding one federal law claim. Lopez and the NMCD removed the lawsuit to this Court and now move for dismissal. The Court will grant the motion to dismiss in part.

---

[1] Although Ortega adds two other individuals—John Gay and Jerry Roark—to the caption in his response brief (*see* Doc. 5 at 1), he may not add defendants to this lawsuit without filing an appropriate motion.

[2] Defendants clarify that Lopez was misnamed in the Amended Complaint as "Louise Lopez." (Doc. 1 at 1.)

I.      **Statement of Facts**

A.      **Ortega's placement in the RHU and the conditions of his confinement**

Ortega was in a county jail awaiting trial on a criminal charge in state court. (Doc. 1-3 (FAC) ¶¶ 2, 28.) On October 29, 2018, pursuant to N.M. Stat. Ann. § 33-3-15 and allegedly without holding a hearing, a state district court judge found that Ortega should be placed in NMCD custody for safekeeping. (*Id.* ¶¶ 2, 29.) As a result, Ortega was transferred to the Central New Mexico Correctional Facility (CNMCF) and placed into the RHU in December 2018. (*Id.* ¶¶ 2, 4, 41.)

From December 2018 through late October 2019, Ortega was confined to his cell in the RHU, alone, for 23 hours per day on weekdays and 24 hours on weekends. (*Id.* ¶¶ 7, 17, 41.) Ortega's cell contained a stool, a desk, and a "hard bed with a thin mattress." (*Id.* ¶ 45.) Ortega asserts that Defendants neither cleaned his cell nor reliably provided for his personal hygiene needs. (*Id.* ¶ 46.) Nor did they "provide effective medical treatment." (*Id.* ¶ 47.) For example, Defendants provided ineffective hydrocortisone cream to treat a severe rash and on one occasion gave Ortega the wrong diabetes medication, resulting in a severe reaction. (*Id.* ¶¶ 47, 49.) Ortega also developed severe back pain and high blood pressure during his confinement. (*Id.* ¶¶ 45, 48.) Moreover, although Defendants knew that Ortega is mentally ill and takes anti-psychotic medication, they kept him in the RHU despite the known and obvious risks inherent in extended solitary confinement. (*See id.* ¶¶ 18–19, 50.) Ortega's mental health was also negatively affected by the fact that he was denied contact with his family. (*Id.* ¶ 53.)

B.      **Relevant NMCD policies and state statutes**

Ortega was housed in the RHU pursuant to NMCD Policy CD-143500.[3] (*Id.* ¶ 63.) This

---

[3] The Court takes judicial notice of the NMCD policies to which Ortega refers in his First Amended Complaint. All current policies are available at the New Mexico Corrections Department's website, https://www.cd.nm.gov/policies/

policy provides that county jail inmates transferred to the NMCD for safekeeping will be segregated and placed in the RHU. (*Id.*) Under NMCD Policy CD-083101,[4] Lopez was obligated to "[c]onduct interviews with all inmates who are placed in Restrictive Housing[ or] Pre-Hearing Detention" units.[5] (*Id.* ¶ 56.)

### C.   Defendants' conduct and Ortega's removal from the RHU

Edgman was NMCD's interim warden. (*Id.* ¶ 8.) Lopez, an NMCD employee, managed the RHU. (*Id.* ¶ 9.) Lopez regularly interacted with Ortega in the RHU. (*Id.* ¶ 54.) "Lopez personally acknowledged . . . that [Ortega] was not being treated fairly and [stated] that he would work on 'getting him out.'" (*Id.*) "Lopez's job duties included acting [as] a jailor for all pretrial detainees placed in NMCD's custody. These duties included but were not limited to maintaining public order and holding persons accused of a criminal offense in custody." (*Id.* ¶ 55.) Lopez also made "rounds in the [RHU], [spoke] with inmates, and personally participat[ed] in the day to day operation of the [RHU]." (*Id.*) Lopez knew that Ortega had been in the RHU "for an exceptionally long time and a longer period of time than NMCD policy permitted." (*Id.* ¶ 57.) Lopez never arranged for a review of Ortega's placement or for his removal. (*Id.*)

On "August 23, 2019, NMCD released the first quarterly report required by New Mexico's

---

(last visited Mar. 14, 2022). *See, e.g., Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs*, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017).

[4] Ortega identifies this policy as CD-083100. (1st. Am. Compl. ¶ 56.) On the NMCD website, however, the cited passage appears in CD-083101, which is part of the same document that begins with CD-083100. *See* CD-083100, N.M. Corr. Dep't, at *5, available at https://www.cd.nm.gov/wp-content/uploads/2019/06/CD-083100.pdf (last visited Mar. 14, 2022).

[5] The First Amended Complaint contains several factual allegations regarding NMCD Policy CD-141500, which requires periodic reviews of inmates housed in the RHU. (*See, e.g.,* FAC ¶¶ 31–33.) Lopez asserts in his motion that CD-141500 "does not direct NMCD officials to abide by CD-141500" with respect to pretrial detainees. (Doc. 2 at 2.) Ortega does not respond to this assertion, nor does he discuss CD-141500 in his response brief. (*See* Doc. 5.)

Restricted Housing Act[, N.M. Stat. Ann. §§ 33-16-1–7].ʺ[6] (*Id.* ¶ 35 (citing N.M. Stat. Ann. § 33-3-15).) The report showed that Ortega had been placed in the RHU because he was "pending transfer to another facility." (*Id.* ¶ 37.) In October 2019, the Santa Fe New Mexican newspaper "published an article examining the NMCD report." (*Id.* ¶ 40 (citing Phaedra Haywood, *Report examines solitary confinement in New Mexico*, Santa Fe New Mexican (Oct. 17, 2019), available at https://www.taosnews.com/news/crime/report-examines-solitary-confinement-in-new-mexico/article_edb6c637-53c4-5dfc-81ea-4bb73653ab26.html).) The article discussed Ortega and quoted NMCD spokesperson Eric Harrison, who stated that the NMCD does not "have control over [Ortega's] trial date . . . ." Haywood, *supra*. Harrison continued, "It was 'hopefully the trial is soon, the trial is soon,' but at certain point, [ten] months later, trial clearly is not soon. It's time to do something." *Id.* Harrison concluded that "right now they are working to get him out of solitary." *Id.* Shortly after the article was published, Ortega's "'rec time' was increased to two hours each day because, according to a[n] NMCD guard, [Ortega] had been in solitary a long time and had been 'good.'" (FAC ¶ 44.) Additionally, Ortega "was only moved from [the RHU] after his story appeared in the Santa Fe New Mexican." (*Id.* ¶ 57.) Ortega "was never accused of any disciplinary violation by [the] NMCD and was never accused of committing a crime while in NMCD custody." (*Id.* ¶ 34.)

### D.   Relevant procedural history

Ortega filed suit against Edgman, Lopez, the NMCD, and the Doe defendants in state court on June 23, 2020, alleging four state law claims. (*See* Doc. 1-1.) Defendants filed a motion to dismiss on September 3, 2020 (Doc. 1-4 at 6–14), which the state court granted on June 23, 2021

---

[6] New Mexico enacted the Restricted Housing Act, N.M. Stat. Ann. §§ 33-16-1–7, in July 2019. This Act requires correctional facilities to produce quarterly reports that identify inmates placed in restrictive housing, the reasons for the placement, and the dates of placement and release. § 33-16-5(A)(1).

(*id.* at 46–47). Ortega filed his First Amended Complaint on July 22, 2021, and included a federal claim for the first time. (*See* FAC.) Lopez and the NMCD removed the lawsuit to this Court on August 4, 2021. (Doc. 1.)

## II.     Legal Standards

### A.     Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1161 (10th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation omitted). The Court will "accept as true 'all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.'" *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quotation omitted).

## III.    Ortega has plausibly alleged a procedural due process claim under 42 U.S.C. § 1983.

In Count V, Ortega brings a claim under § 1983 and asserts that Lopez, Edgman, and the Doe defendants, in their individual capacities,[7] violated his rights under the Eighth and Fourteenth Amendments. (*See* FAC ¶¶ 106–17.) The Court will dismiss with prejudice any claim brought under the Eighth Amendment, as "[p]retrial detainees are protected under the Due Process Clause"

---

[7] NMCD is an agency of New Mexico and claims against the NMCD are claims against the state. *Martin v. N.M. Corr. Dep't*, No. CV 17-00771 MCA/SMV, 2018 WL 1224446, at *5 (D.N.M. Mar. 7, 2018). Because "a State is not a person within the meaning of § 1983[,]" Ortega may not assert a claim under § 1983 against the NMCD. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63–64 (1989); *Martin*, 2018 WL 1224446, at *5. The same holds true for the named defendants in their "official capacity," because such suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quotation omitted). An official capacity suit is "in all respects other than name, to be treated as a suit against the entity." *Id.* at 166 (citation omitted). Thus, to the extent Ortega attempts to assert a claim under § 1983 against the NMCD or against any individual defendant in an official capacity, such claims are dismissed with prejudice. (*See, e.g.*, 1st Am. Compl. ¶¶ 8–9.)

of the Fourteenth Amendment. *Glover v. Gartman*, 899 F. Supp. 2d 1115, 1133 (D.N.M. 2012) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)).

The Fourteenth Amendment Due Process Clause protects individuals from the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause provides two types of protection: "(1) 'substantive due process' prevents the government from engaging in action that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty,' and (2) 'procedural' due process ensures that government action depriving a person of liberty is implemented in a fair manner." *Cook v. Bd. of Cnty. Comm'rs for Cnty. of Curry*, No. 2:16-CV-00597 JCH/CG, 2018 WL 555458, at *6 (D.N.M. Jan. 23, 2018) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). Ortega asserts a violation of his right to procedural due process. (*See* FAC ¶ 91; Doc. 5 at 11–12.)

"To determine generally whether a person's procedural due-process rights were violated, a court looks at whether the person (i) possesses a protected liberty interest and (ii) was afforded an appropriate level of process." *Cook*, 2018 WL 555458, at *6 (citing *Sandin v. Conner*, 515 U.S. 472, 487 (1995); *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006)). "Under the Due Process Clause, a pretrial detainee may be subject to conditions and restrictions of incarceration so long as they do not amount to punishment prior to a lawful conviction." *Id.* (citing *Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1106 (10th Cir. 2005); *Littlefield v. Deland*, 641 F.2d 729, 731 (10th Cir. 1981) ("[C]onstitutionality under a due process analysis of the  nature or duration of pretrial detention turns on whether such detention amounts to 'punishment' in the constitutional sense.")); *see also Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979). "Conditions of pretrial detention that constitute punishment cannot be constitutionally imposed without due process of law." *Cook*, 2018 WL 555458, at *6 (citing *Bell*, 441 U.S. at 538). To determine whether

the conditions constitute punishment, courts "ask whether an 'expressed intent to punish on the part of detention facility officials' exists." *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (quoting *Bell*, 441 U.S. at 538). "If so, liability may attach." *Id.* "If not, a plaintiff may still prove unconstitutional punishment by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective[,]" *id.* (citing *Bell*, 441 U.S. at 539), or that "it appears excessive in relation to the alternative purpose assigned[,]" *Bell*, 441 U.S. at 538 (citation omitted).

Relevant to Lopez's motion, Ortega argues that he was placed into administrative segregation without "an opportunity to be heard or any written explanation for his placement." (FAC ¶ 30.) Lopez argues that according to the Tenth Circuit's decision in *Peoples*, Ortega did not have a liberty interest in such a review. (Doc. 2 at 19 (discussing 422 F.3d at 1106).) In *Peoples*, a pretrial detainee alleged that "he was placed in segregation without a hearing . . . ." 422 F.3d at 1105–06. The Tenth Circuit discussed the difference between conditions "imposed for the purpose of punishment" versus those that are simply "incident to some other legitimate government purpose." *Id.* at 1106 (citing *Bell*, 441 U.S. at 538). If restrictions are "not reasonably related to a legitimate [governmental] goal" or are "arbitrary or purposeless[,] a court permissibly may infer that the purpose of the governmental action is punishment." *Id.* (citing *Bell*, 441, U.S. at 539). The Tenth Circuit found that "ensuring security and order at the institution is a permissible nonpunitive objective . . . ." *Id.* (citing *Bell*, 441 U.S. at 561). Accordingly, it held that "no process is required if [a pretrial detainee] is placed in segregation not as punishment but for managerial reasons." *Id.* (quoting *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002)).

Here, Ortega acknowledges that he was placed in the RHU pursuant to NMCD Policy CD-143500. (FAC ¶ 63.) This policy provides that when NMCD receives pretrial detainees pursuant

to a safekeeping order, the receiving institution "will segregate the inmate from the general population and place the inmate in Restrictive Housing status." (*Id.* (quoting NMCD Policy CD-143500 at 1 ¶ B); *see also* Doc. 2-A at 2.) Lopez contends that this segregation, like that in *Peoples*, was "related to NMCD['s] need to manage its facilities and for security reasons." (Doc. 2 at 20.) Ortega does not attempt to distinguish *Peoples*. (*See* Doc. 5.) Under these circumstances, the Court agrees that Ortega was placed in the RHU "not as punishment but for managerial reasons[,]" and therefore no process was required. *See Peoples*, 422 F.3d at 1106 (quotation omitted).

Ortega next contends that the length of his confinement in the RHU amounts to unconstitutional punishment. (*See* Doc. 5 at 13.) He argues that the asserted governmental purposes of "security" and "management" are inadequate to justify his 11-month segregation. (*Id.*) Ortega cites *Toevs v. Reid*, 685 F.3d 903 (10th Cir. 2012) in support. In *Toevs*, an inmate was placed in administrative segregation and alleged that he did not receive meaningful periodic reviews for a four-year period. 685 F.3d at 912. In examining his claim, the Tenth Circuit noted that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Id. Toevs* is inapposite, however, because the plaintiff there had already been convicted of a crime, and the court used a standard inapplicable to pretrial detainees. *See id.* at 912–14 (considering, pursuant to *Sandin*, 515 U.S. 472, whether the inmate had stated a liberty interest by showing an "atypical and significant hardship"); *see also Dilworth v. Adams*, 841 F.3d 246, 252 (4th Cir. 2016) ("Every federal court of appeals to consider the question has concluded that *Sandin*'s "atypical and significant hardship" standard does not govern the procedural due process claims of pretrial detainees.") (citing, *e.g.*, *Peoples*, 422 F.3d at 1106 n.12). Ortega fails to cite any other case to support a finding that an 11-month confinement to the RHU, standing alone, supports an inference of punishment.

8

Finally, Ortega alleges that it was only after his story was made public that his conditions of confinement changed. (FAC ¶¶ 5, 44, 57.) Shortly after the Santa Fe New Mexican published an article documenting the use of solitary confinement at the NMCD and sharing Ortega's story, Ortega was given an extra hour per day of rec time and was later moved out of the RHU. (*Id.*) Ortega contends that this shows that his confinement to the RHU was not related to any legitimate penological purpose. (Doc. 5 at 12.) The Court agrees that these allegations detract from Lopez's theory that Ortega's segregation was purely for managerial and/or security purposes. There are no facts alleged to show that NMCD's managerial or security needs changed after the newspaper article was published to warrant releasing Ortega from the RHU. If Ortega was released from the RHU simply because of the publicity, it lends credence to his argument that his earlier confinement was "arbitrary or purposeless." *See Peoples*, 422 F.3d at 1106 (citing *Wolfish*, 441 U.S. at 539). On this point, the Court finds that Ortega has adequately alleged an inference of punishment that, "absent a determination of guilt, cannot be imposed in accordance with the due process clause of the fourteenth amendment." *See Littlefield*, 641 F.2d at 732 (citations omitted).

Lopez contends that the allegations are insufficient to show that he was personally involved in a violation of Ortega's rights. (Doc. 2 at 17.) The Complaint alleges, however, that Lopez had oversight and managerial responsibility for the RHU. (FAC ¶ 9.) Lopez was responsible for interviewing RHU inmates, regularly interacted with Ortega, and told him that "he would work on 'getting him out.'" (*Id.* ¶¶ 54, 56.) Despite managing the RHU, Lopez "never arranged for a review" of Ortega's placement. (*Id.* ¶ 57.) These allegations are sufficient at this stage to allow the Court to draw a reasonable inference that Lopez had at least some responsibility for Ortega's confinement in the RHU. The Court will deny Lopez's motion as to the procedural due process claim.

**IV.   The Court will dismiss Ortega's state law claims.**

Ortega originally brought four state claims: (1) intentional deprivation of rights guaranteed by the New Mexico Constitution; (2) negligent deprivation of rights guaranteed by the New Mexico Constitution; (3) false imprisonment under the New Mexico Tort Claims Act (NMTCA); and (4) negligent maintenance of a building under the NMTCA. (*See* Doc. 1-1.) Defendants moved to dismiss, and the state court granted the motion. (*See* Doc. 1-4 at 6–14, 46–47.) Ortega filed an amended complaint and added the claim under 42 U.S.C. § 1983. (*See* FAC.) Defendants then removed the case to this Court and filed their motion to dismiss. (*See* Docs. 1–2.)

Lopez asks the Court to dismiss Ortega's state law claims under the "law of the case doctrine." (Doc. 2 at 5–6.) "The doctrine of 'law of the case . . . relates to litigation of the same issue recurring within the same suit.'" *Laughlin v. Convenient Mgmt. Servs., Inc.*, 308 P.3d 992, 998 (N.M. Ct. App. 2013) (quoting *Cordova v. Larsen*, 94 P.3d 830, 834 (N.M. Ct. App. 2004)). "Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes a binding precedent in successive stages of the same litigation." *Id.* (quoting *Cordova*, 94 P.3d at 834). "It is based on 'a matter of precedent and policy; it is a determination that, in the interests of the parties and judicial economy, once a particular issue in a case is settled it should remain settled.'" *Id.* (quoting *Trujillo v. City of Albuquerque*, 965 P.2d 305, 316 (N.M. 1998)). "As a general matter, when a case is transferred from one district court to another, decisions of the transferring court are binding on the transferee court." *Cordova*, 94 P.3d at 834 (citation omitted). "However, there are several factors that counsel against a court's application of law of the case doctrine." *Id.* "Law of the case doctrine is discretionary, and courts will not use the doctrine when the decision to be applied preclusively is clearly erroneous or when it would result in manifest injustice." *Id.* (citing *Trujillo*, 965 P.2d at 316).

The state court dismissed Ortega's four state law claims "with prejudice" but also granted Ortega leave to amend his complaint. (*See* Doc. 1-4 at 46–47.) A "federal court is not bound even by a decision concerning state law, if the state court's decision is wrong as a matter of law." *Loya v. Presbyterian Health Care Servs.*, Inc., No. CIV 00-1773 BB/DJS, 2001 WL 37124838, at *2 (D.N.M. Sept. 17, 2001). To avoid manifest injustice, the Court will look at the parties' substantive arguments regarding his state law claims.

### A.     Counts I–III

Ortega alleges three claims against Lopez, Edgman, the Doe defendants, and the NMCD, pursuant to § 41-4-12 of the NMTCA: (1) in Count I, he asserts that Defendants intentionally violated his rights to procedural due process and equal protection and to be free from cruel and unusual punishment under the New Mexico Constitution (FAC ¶¶ 66–84); (2) in Count II, Ortega alleges that Defendants' negligence deprived him of the same rights under the New Mexico Constitution[8] (*id.* ¶¶ 85–92); and (3) in Count III he asserts that Defendants are liable for false imprisonment (*id.* ¶¶ 93–98). "New Mexico has enacted a limited waiver of liability for common law tort claims against state employees in the NMTCA." *Garcia v. Martinez* ("*Garcia I*"), 414 F. Supp. 3d 1348, 1357 (D.N.M. 2019) (citing N.M. Stat. Ann. § 41-4-1–30). "Unless excepted, a 'governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort.'" *Id.* (quoting N.M. Stat. Ann. § 41-4-4). "The NMTCA waives immunity for intentional torts such as assault, battery, false imprisonment, and deprivation of constitutional rights only when they are committed by law enforcement officers acting within the scope of their duties." *Id.* (citing N.M. Stat. Ann. § 41-4-12). To succeed on a claim under

---

[8] Ortega does not discuss the NMTCA in Count II of his First Amended Complaint, but he clarifies in his response brief that this count is brought pursuant to § 41-4-12. (*See* FAC ¶¶ 85–92; Doc. 5 at 9.)

§ 41-4-12, "a plaintiff must demonstrate that the defendant [was a] law enforcement officer[ ] acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in [the NMTCA] or a deprivation of a right secured by law." *Id.* (quoting *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 916 P.2d 1313, 1316 (N.M. 1996)).

At the time Ortega was housed in the RHU, § 41-4-12 read:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12 (eff. to May 19, 2020). Lopez argues that Counts I–III should be dismissed as to him and the NMCD, because they are not "law enforcement officers" as a matter of law. (*See* Doc. 2 at 8–13.)

Prior to amendments to § 41-4-12 in May 2020 and September 2020, New Mexico authority dictated that "[t]he principal duties of a public employee determine if they are a 'law enforcement officer' under the NMTCA." *Garcia I*, 414 F. Supp. 3d at 1358 (citing *Vigil v. Martinez*, 832 P.2d 405, 411 (N.M. Ct. App. 1992)); *see also* N.M. Stat. Ann. § 41-4-3(D) (defining law enforcement officer, in relevant part, as "a full-time salaried public employee of a governmental entity . . . whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order[,] or to make arrests for crimes"). Further, "New Mexico courts do not consider prison guards and other state corrections officers to be 'law enforcement officers' under the NMTCA." *Garcia I*, 414 F. Supp. 3d at 1357 (citing *Callaway v. N.M. Dep't of Corr.*, 875 P.2d 393, 397 (N.M. Ct. App. 1994)). "The *Callaway* court found that the principal duties of prison guards are 'to hold in custody persons who have already been

12

convicted rather than merely accused of a criminal offense[.]'" *Id.* (quoting *Callaway*, 875 P.2d at 397). "[M]aintenance of public order relates to a public not a penitentiary setting, and although prison guards may have the supplemental power to arrest [under certain circumstances,] . . . their principal statutory duties are those set forth in Section 33-2-15." *Id.* at 1357–58 (quoting *Callaway*, 875 P.2d at 397).

Relying on *Callaway*, United States District Judge James O. Browning has twice held that corrections officers at CNMCF do not fall under the definition of law enforcement officer. *See Lymon v. Aramark*, 728 F. Supp. 2d 1222, 1269–70 (D.N.M. 2010) ("corrections officers do not fit within the plain language of § 41-4-3D, and thus . . . § 41-4-12 does not waive immunity"); *Aicher v. Ali*, No. CV 15-0552 JB/SCY, 2016 WL 3129628, at *3 (D.N.M. May 31, 2016) ("correctional officers at a state penitentiary are not law enforcement officers under the New Mexico Tort Claims Act") (citations omitted). In *Lymon*, Judge Browning noted that "[t]here are rational reasons that the New Mexico Legislature has made a distinction between detention officers and prison guards." 728 F. Supp. 2d at 1269. "For those citizens presumed innocent or still only accused, the Legislature was willing to waive immunity for certain torts; for those already convicted of crimes, the Legislature was not willing to waive immunity." *Id.* Here, while Lopez clearly had "managerial responsibility" for the RHU, which occasionally housed pretrial detainees under safekeeping orders, there are no allegations to support a finding that Lopez's *primary duties* included housing pretrial detainees at CNMCF. *See* N.M. Stat. Ann. § 33-2-15 ("The employees of the penitentiary shall perform such duties" related to "the custody, government, employment and discipline of the *convicts* as shall be required of them") (emphasis added); *May v. Dona Ana Cnty. Jail*, No. CIV 18-0126 JB/LF, 2018 WL 4031063, at *4 (D.N.M. Aug. 23, 2018) ("The NMTCA provides a waiver of sovereign immunity under N.M. Stat. Ann. § 41-4-12 when "the

facility in which [correctional officers] work primarily holds inmates awaiting trial rather than convicts.") (citing *Salazar v. San Juan Cnty. Det. Ctr*, Nos. CIV 15-0417, CIV 15-0439, CIV 15-0497, CIV 15-0526, 2016 WL 5376320, at *12 (D.N.M. September 20, 2016); *Davis v. Bd. of Cnty. Comm'rs of Dona Ana Cnty.*, 987 P.2d 1172, 1183 (N.M. Ct. App. 1999) ("It is settled New Mexico law that directors of a county detention center, in which the inmates are primarily 'accused of a criminal offense' and awaiting trial, fall within the definition of law enforcement officers under the Act.")).

Ortega argues that under the September 2020 amendment to § 41-4-12, Lopez should be classified as a law enforcement officer. (Doc. 5 at 5–8.) He contends that Lopez relies on a "repealed version of the NMTCA" that has been "clarified" and removes the "principal duties" test embedded in § 41-4-3(D). (*Id.* at 6.) The most recent version of the NMTCA defines law enforcement officer, for purposes of § 41-4-12, as "a public officer or employee vested by law with the power to maintain order, to make arrests for crime or to detain persons suspected of *or convicted of committing a crime*, whether that duty extends to all crimes or is limited to specific crimes." § 41-4-12 (Sept. 20, 2020) (emphasis added). Ortega argues that "as a clarification of existing law," the amendment applies retroactively. (Doc. 5 at 7.)

"[T]he general rule is that statutes apply prospectively unless the Legislature manifests clear intent to the contrary." *Garcia v. Martinez* ("*Garcia II*"), No. CV 19-641 JAP/LF, 2020 WL 2615533, at *2 (D.N.M. May 22, 2020) (quoting *Wood v. State of N.M. Educ. Ret. Bd.*, 250 P.3d 881, 885–86 (N.M. Ct. App. 2011)). "Where the language of a statute 'does not specifically evince a legislative intent that the act should be applied retrospectively,' the law must be applied prospectively." *Id.* (quoting *City of Albuquerque v. State ex rel. Vill. of Los Ranchos de Albuquerque*, 808 P.2d 58, 66 (N.M. Ct. App. 1991)). "The presumption [against retrospective

14

legislation] is premised upon policy considerations that individuals, in planning and conducting their business, should be able to rely with reasonable certainty on existing laws." *Id.* (quoting *City of Albuquerque*, 808 P.2d at 66).

"On the other hand, a statute or regulation is considered retroactive if it impairs vested rights acquired under prior law or requires new obligations, imposes new duties, or affixes new disabilities to past transactions." *Id.* (quoting *Wood*, 250 P.3d at 886). "Where a statutory amendment clarifies the existing law, that amendment is retroactive." *Id.* (citing *Swink v. Fingado*, 850 P.2d 978, 987–88 (N.M. 1993)). "A clarification occurs when, rather than amending an existing law to provide a change, a statutory provision is amended to clarify what was previously implicit in the law." *Id.* (quoting *Wood*, 250 P.3d at 886).

Senior United States District Judge James A. Parker analyzed an identical argument in *Garcia II*. He noted:

> It may be easy, at first blush, to conclude that the 2020 Amendments were "clarifications," given that the title of the act includes "Clarifying Duties Of A Law Enforcement Officer In The Tort Claims Act." But the amendment provides a change to the existing definition of "law enforcement officer," rather than clarifying an implicit understanding of that definition. This is a "clarification" in name only. Nothing suggests that the legislature's change in the definition of "law enforcement officer" was intended to clarify a prior implicit understanding of that definition. The Court must presume that the state legislature is aware of the law when it makes changes to that law. *See Herrera v. Quality Imports*, 992 P.2d 313, 316 (N.M. Ct. App. 1999). If the state legislature "intended to simply correct an existing oversight in the law, or clarify what the law was always meant to say, it should have expressly provided for retroactive application in the amendment's text." *Wood*, 250 P.3d at 887.

2020 WL 2615533, at *3. Judge Parker concluded that the legislature did not intend for the new definition of law enforcement officer to apply retroactively. *See id.* The Court agrees with this result and finds that Counts I–III should be dismissed as to Lopez.

With respect to the NMCD, Ortega alleges that "even if Lopez does not satisfy the

definition of law enforcement officer, . . . NMCD is the proper named defendant where the John Doe guards breached a duty owed to Plaintiff." (Doc. 5 at 9 (citing *Abalos v. Bernalillo Cnty. Dist. Att'y's Off.*, 734 P.2d 794, 799 (N.M. Ct. App. 1987)).) "Under New Mexico law, a governmental entity remains vicariously liable 'for any tort of its employee acting within the scope of duties for which immunity is waived.'" *Thorn-Freeman v. Valdez*, No. CV 20-448 JAP/GJF, 2020 WL 5369063, at *11 (D.N.M. Sept. 4, 2020) (quoting *Silva v. New Mexico*, 745 P.2d 380, 385 (N.M. 1987)). "To name a particular entity in an action under the NMTCA requires two things: a liable public employee 'who meets one of the [NMTCA] waiver exceptions [ ]; and [ ] an entity that has immediate supervisory responsibilities over the employee.'" *Id.* (quoting *Abalos*, 734 P.2d at 799). Yet, the fact remains that the Doe defendants are also prison employees. Ortega made no allegations to show that the Doe defendants' primary duties included housing pretrial detainees. *See May*, 2018 WL 4031063, at *4. ("The NMTCA provides a waiver of sovereign immunity under N.M. Stat. Ann. § 41-4-12 when "the facility in which [correctional officers] work primarily holds inmates awaiting trial rather than convicts."). Accordingly, his argument on this point fails. Counts I–III will be dismissed as to all Defendants.

### B.    Count IV

Ortega brings a claim against Defendants under N.M. Stat. Ann. § 41-4-6 in Count IV. (FAC ¶¶ 99–105.) Section 41-4-6(A) waives immunity "for damages resulting from bodily injury . . . caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6(A). Here, Ortega alleges that Defendants "simpl[y] repurposed a solitary confinement unit suited for temporarily punishing unruly . . . or dangerous convicts" into a unit for pretrial detainees, which was negligent. (FAC ¶ 101.) Specifically, Defendants' decision to

subject Ortega "to a long period of solitary confinement . . . breached [Defendants'] duty to house [him] in a reasonably prudent manner." (*Id.* ¶ 104.)

Lopez argues that this count "involves alleged negligence . . . from [Defendants'] custody and/or classification of pre-trial detainees in [the] RHU." (Doc. 2 at 15.) Lopez further argues that to the extent Ortega "alleges that the very act of placing pre-trial detainees in [the] RHU is a dangerous condition," or "that being placed in [the] RHU becomes a dangerous condition only after [one] is held in [the] RHU for a certain amount of time, the existence of a dangerous condition would" be completely fact dependent and would "involve discrete administrative decisions on an individual-by-individual basis." (Doc. 8 at 7.) The New Mexico Supreme Court has foreclosed claims brought under § 41-4-6 based on "the security, custody, and classification of inmates." *Archibeque v. Moya*, 866 P.2d 344, 347 (N.M. 1993). In *Archibeque*, the plaintiff inmate was transferred to a new facility. 866 P.2d at 346. Upon arrival, he met with an intake officer who asked if he had any known enemies at the new facility. *Id.* Archibeque disclosed one person (Gallegos), and the officer mistakenly assured him that Gallegos had been transferred. *Id.* Gallegos attacked Archibeque that night. *Id.* The state supreme court found that the officer "was not operating and maintaining the prison's physical premises when she negligently classified Archibeque as an inmate that could be released into the general prison population" but rather "was performing an administrative function associated with the operation of the corrections system." *See id.* at 347. "Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." *Id.*

Ortega believes that the Court should follow dicta contained in a footnote of Chief Justice Ransom's concurrence in *Archibeque*, which states: "While a segment of the population at risk might justify a waiver of immunity under Section 41-4-6, a situation in which a single inmate is

put at risk is not comparable." 8666 P.2d at 349 n.3. "Chief Justice Ransom, in his concurrence, elaborated on the significance between a 'discrete administrative decision,' which does not waive immunity, and 'a general condition of unreasonable risk from negligent security practices,' which could waive immunity." *Lymon*, 728 F. Supp. 2d at 1266 (citing *Archibeque*, 866 P.2d at 350). "Chief Justice Ransom stated that the classification of Archibeque did not change the condition of the premises, and that Archibeque's injuries did not arise from a condition of the premises, but from the classification itself." *Id.* (citing *Archibeque*, 866 P.2d at 350). Ortega contends that the classification decision here is not discrete but affects the class of pretrial detainees housed pursuant to a safekeeping order. (Doc. 5 at 10–11.) The inmate in *Lymon*, who complained that he was negligently cleared to work in the prison kitchen despite an injury, argued that the facility had similarly misclassified other inmates. *See id.* at 1230, 1266. The court found the allegations insufficient "to support finding a waiver under § 41-4-6." *Id.* at 1266. "To come within Chief Justice Ransom's footnote, this misclassification must raise security risks, not health risks." *Id.* Because Lymon's claim did not involve security, the court found that it did not fall within § 41-4-6's waiver. *See id.* ("It appears best to take the majority in *Archibeque v. Moya* at its word— "Section 41-4-6 does not include the . . . classification of inmates"—rather than find the footnote creates an exception that New Mexico courts have not yet recognized.") The same is true here: Ortega has not alleged any security risk posed from housing pretrial detainees in the RHU. Like the court in *Lymon*, the undersigned "is reluctant to expand Chief Justice Ransom's possible exception to other areas beyond prison security." *See id.* at 1266–67.

Ortega also argues that the decision in *Callaway* supports a finding of waiver. (*See* Doc. 5 at 10.) In *Callaway*, the New Mexico Court of Appeals found that the inmate plaintiff "stated a claim sufficient to waive immunity under Section 41-4-6 because [the defendant guards] knew or

should have known that roaming gang members with a known propensity for violence" in an unsecured area of the prison created a dangerous condition to a class of users. 875 P.2d at 399. Yet, Ortega has made no factual allegations to show that classifying pretrial detainees under safekeeping orders into the RHU created a "danger" to any inmate besides himself. (*See* FAC.) The *Lymon* court found that where the inmate had not pled facts to show that alleged misclassifications created a danger to anyone else, the complaint did not state a plausible claim that there was "a dangerous condition on the premises of the penitentiary . . . ." *Lymon*, 728 F. Supp. 2d at 1267 (quoting *Callaway*, 875 P.2d at 399). The Court agrees with this reasoning. Because Ortega has not shown that his claim of negligence goes beyond custody or classification, the Court will dismiss Count IV as to all defendants.

## V.     All remaining claims are dismissed.

Lopez also argues that Ortega inadequately pled and/or abandoned several claims: a claim for violation of his rights under the Equal Protection Clause of the United States and New Mexico Constitutions; and a claim for violation of his Fourteenth Amendment rights for deliberate indifference to both his serious medical needs and to his conditions of confinement. (*See* Docs. 2 at 23–24; 8 at 10.)

### A.     Violation of rights under the Equal Protection Clause

Ortega clarifies that he did not intend to bring a claim based on violation of the Equal Protection Clause. (Doc. 5 at 14.) Accordingly, any such claim is dismissed.

### B.     Deliberate indifference to serious medical needs

Ortega did not specifically respond to Defendants' argument regarding the claim for deliberate indifference to his serious medical needs. (*See* Doc. 5.) In failing to respond, Ortega has waived this claim. *See Lewis v. XL Catlin*, 542 F. Supp. 3d 1159, 1168 n.6 (D.N.M. 2021), *appeal*

*dismissed*, No. 21-2077, 2021 WL 6197126 (10th Cir. Sept. 27, 2021) ("Implicit in [D.N.M. LR-Civ. 7.1(b)] is that the failure to respond to an argument raised in a motion constitutes consent to grant the motion to the extent associated with that particular argument.") (citing *Cole v. New Mexico*, 58 F. App'x 825, 829 (10th Cir. Feb. 6, 2003) (argument waived when not raised in initial response to motion to dismiss); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. Aug. 28, 2001) (plaintiff abandoned claim when failed to respond to arguments made in support of summary judgment)). Thus, the Court will grant the motion to dismiss the claim for deliberate indifference to serious medical needs against Lopez and the NMCD.

### C.     Deliberate indifference to conditions of confinement

Similarly, Ortega did not specifically respond to Defendants' motion regarding a claim for deliberate indifference to inhumane conditions of confinement. (*See* Docs. 2 at 20–23; 5 at 12–14; 8 at 10.) This claim amounts to one for violation of Ortega's substantive due process rights. *See, e.g.*, *Romero v. Bd. of Cnty. Comm'rs for the Cnty. of Curry*, 202 F. Supp. 3d 1223, 1261–62 (D.N.M. 2016).

In response to Defendants' arguments regarding Ortega's conditions of confinement, Ortega simply repeats that the conditions were "sufficiently serious" because he was in the RHU for an exceptionally long time" without "hav[ing] his status reviewed." (Doc. 5 at 14 (quoting FAC ¶ 57 (quotation marks omitted)).) This relates, however, to his claim for procedural due process. *See Romero*, 202 F. Supp. 3d at 1263 (explaining the difference between a procedural due-process claim, which "asserts a constitutional injury from being subjected to inhumane conditions without process," and a substantive due-process claim, "addresses the inhumane conditions themselves as well as the lack of medical care"). Ortega does not argue that the inhumane conditions and alleged lack of medical care themselves violated his constitutional rights. (*See* Doc. 5.) The Court declines

to mount this argument for him and will grant the motion to dismiss the claim for deliberate indifference to inhumane conditions of confinement against Lopez and the NMCD.

## VI.    Conclusion

In summary, the Court finds the following:

<u>Counts I–IV</u>: The Court dismisses the state law claims as to all defendants.

<u>Count V</u>: Ortega's claim for a violation of his procedural due process rights pursuant to § 1983 remains against Lopez and the Doe defendants in their individual capacities. Additionally, the Court dismisses any claim brought for violations of Ortega's rights under the Equal Protection Clause, the Eighth Amendment, and for deliberate indifference to his serious medical needs or conditions of confinement.

Ortega briefly requests leave to file an amended complaint. (Doc. 5 at 15.) Because his request does not conform to D.N.M. LR-Civ. 15.1, the Court will deny it.

**THEREFORE,**

**IT IS ORDERED** that Defendant NMCD and Luis Lopez's Motion to Dismiss Plaintiff's First Amended Complaint is **GRANTED IN PART** as detailed in this Opinion.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE