## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MAX ORTEGA III,

   Plaintiff,

v.             No. CIV 21-0728 RB/JHR

WILLIAM EDGMAN, LOUISE LOPEZ,[1]
NEW MEXICO CORRECTIONS
DEPARTMENT, and DOES (1–50),

   Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

  While Plaintiff Max Ortega III was awaiting trial on a criminal charge, a state court district judge placed him into the custody of the New Mexico Corrections Department (NMCD) on a "Safekeeping Order" pursuant to N.M. Stat. Ann. § 33-3-15. According to NMCD policy, Ortega was housed in the "Restrictive Housing Unit" (RHU or solitary confinement). Ortega was kept in the RHU for almost a year awaiting trial. He alleges that he never received a review of his placement and that his conditions of confinement constituted punishment in violation of his due process rights. He brings suit against Luis Lopez, the RHU Manager. Lopez now moves for summary judgment on the basis of qualified immunity. For the reasons discussed in this Opinion, the Court will grant in part and deny in part Lopez's motion.

## I. Factual and Procedural History

### A. Ortega's Confinement in the RHU

  In October 2018, Ortega was a pretrial detainee in the Colfax County Detention Center awaiting trial on state felony charges. (Docs. 1-3 (Am. Compl.) ¶ 28; 35-2 ¶ 1.) On October 18,

---

[1] Defendants have clarified that Lopez was misnamed in the Amended Complaint as "Louise Lopez." (Doc. 2 at 1.)

2018, after allegations that Ortega was involved in an altercation with another inmate, the deputy district attorney filed a motion in state district court seeking review of Ortega's conditions of release.[2] (Doc. 21-B.) On October 29, 2018, without comment on the allegations in the state's motion, the state court entered an Order Granting the State's Motion to Review Conditions of Release and Transfer of Prisoner to the Penitentiary (the Safekeeping Order). (Doc. 21-C.) The court ordered that Ortega be moved "to the Department of Corrections for housing during the pendency of this case pursuant to [N.M. Stat. Ann.] § 33-3-15" in the interest of "the public welfare and [/] or the safe custody of the defendant." (*Id.*) This statute provides in part:

> Whenever the public welfare or the safe custody of a prisoner shall require, any district judge in the state of New Mexico in his discretion may order any person charged with the commission of a crime, or any person in the custody of the sheriff of any county in the district of the said judge, to be removed to another county jail, or to the state penitentiary, or to any other place of safety, when, in the opinion of the said district judge, it is advisable that such person or persons shall be removed for any purpose whatsoever.

N.M. Stat. Ann. § 33-3-15.

Ortega was transferred to the Central New Mexico Correctional Facility (CNMCF) on December 21, 2018, pursuant to the Safekeeping Order. (*See* Am. Compl. ¶ 30; Doc. 35-2 ¶¶ 2–3; 35-4 at 2.) Upon his arrival, Ortega was placed in the RHU in accordance with NMCD Policy CD-143500–143501, entitled Safekeeping of County Jail Inmates (the Safekeeping Policy). (*See* Am. Compl. ¶ 63; Docs. 21 at 4 ¶ 9; 35 at 4 ¶ 9; 35-2 ¶ 4.) Lopez was the RHU Manager during Ortega's confinement. (Am. Compl. ¶¶ 4, 9; *see also* Doc. 21-E.)

Ortega's trial was originally scheduled for September 24, 2018, but it was postponed twice: first to November 25, 2019, and then to December 9, 2019. (*See* Docs. 21-H; 21-J; 21-L.) Ortega was confined by himself to his cell in the RHU for 23 hours per day, Monday through Friday, and

---

[2] The Court takes notice of the motion without accepting the truth of the allegations therein. (*See infra* Section II.C.)

24 hours per day on weekends. (Doc. 35-2 ¶ 6.) On weekdays he received one hour of recreational time and 15 minutes to shower. (*Id.*) He interacted with Lopez "almost daily" but otherwise had no meaningful human contact. (Doc. 35-2 ¶¶ 6–7.) "On multiple occasions, Lopez admitted to [Ortega] that [he] was being treated badly, and that [Lopez] would attempt to get [him] out of RHU." (*Id.* ¶ 8; Doc. 35-4 at 3–4.) On August 5, 2019, Lopez emailed Colfax County Sheriff Leonard Baca, Jr. and said: "Max Ortega has been in our custody since 12/18. Can you let me know when you will be taking him back to your facility[?]" (*See* Doc. 44-1 at 3.) On August 6, 2019, Lopez was forwarded information from Colfax County District Attorney Consuelo Garcia in response to his email. (*See id.* at 2–3.) Garcia stated that they did "not have a trial date for any of Max Ortega's cases[ and h]e will be held in [the Department of Corrections] until the cases are resolved by plea/trial or he is convicted and sentenced to prison." (*Id.* at 3.)

In 2019, the New Mexico Legislature enacted the Restricted Housing Act, which requires correctional facilities to produce "a report every three months documenting how many individuals were placed in restricted housing and the reasons for the placement." *See* Carson Thornton González, *A Deliberate Difference?: The Rights of Incarcerated Individuals Under the New Mexico State Constitution*, 52 N.M. L. Rev. 548, 571–72 (2022) (citing N.M. Stat. Ann. 33-16-5 (2019)). The August 23, 2019 report produced pursuant to § 33-16-5 identified the reason for Ortega's placement in Restrictive Housing as "pending transfer to another facility." (*See* Doc. 54-A; *see also* Doc. 1-3 ¶¶ 35–37.)

In October 2019, the Santa Fe New Mexican newspaper ran an article that discussed the NMCD's "first-ever quarterly report on its use of solitary confinement[,]" which included information on the "reason inmates were held in solitary . . . ." Phaedra Haywood, *Report examines solitary confinement in New Mexico*, Santa Fe New Mexico (Oct. 23, 2019), available at https://

www.taosnews.com/news/crime/report-examines-solitary-confinement-in-new-mexico/article_

edb6c637-53c4-5dfc-81ea-4bb73653ab26.html. The article reported that Ortega had been

confined in solitary confinement awaiting trial since December 2018. (*Id.*) According to Eric

Harrison, an NMCD spokesman, "Ortega has been kept in solitary for nearly a year because his

court date keeps getting postponed[,]" which he asserted was not in either NMCD's or Ortega's

control. *Id.* Harrison is quoted as stating that the Director of Adult Prisons saw the report and "right

now they are working to get [Ortega] out of solitary." *Id.*

"Within days after the article's publication, Lopez told [Ortega] he was increasing

[Ortega's] recreational time to two hours during the week because [he] had 'been good.'" (Doc.

35-2 ¶ 10.) Lopez and an assistant to the warden made the decision to increase Ortega's

recreational time. (*See* Doc. 35-4 at 3.) Ortega remained in the RHU until November 6, 2019, when

he was transported to court for trial. (*See* Doc. 35-4 at 4.)

### B. The Safekeeping and Restrictive Housing Policies

There are two NMCD policies at issue in this lawsuit: the Safekeeping Policy, CD-143500–

143501, and the Restrictive Housing Policy, CD-141500. The parties agree that Ortega was placed

in the RHU pursuant to the Safekeeping Policy. It provides in relevant part:

> Purpose: To set forth procedures and guidelines for the housing and management
> of county jail inmates for safekeeping in institutions designated by the New Mexico
> Corrections Department for the confinement of adult criminal offenders.
>
> Applicability: All employees of adult institutions of the New Mexico Corrections
> Department. . . .[3]
>
> A. NMCD will receive only those county jail inmates whose placement in an
> institution has been ordered by a district judge. . . .

---

[3] Ortega summarily disputes that Lopez "was required to comply with the Safekeeping Policy (CD-143500)." (Doc.
35 at 6.) Yet he ignores the Policy's stated applicability to all NMCD employees. (Doc. 21-E at 1.) Ortega fails to
create a genuine factual dispute on this issue.

B. The institution receiving the inmate for safekeeping will segregate the inmate from the general population and place the inmate in Restrictive Housing status. . . .

C. County jail inmates will abide by the policies and procedures of the receiving institution or those governing Restrictive Housing inmates (*CD-141500*).

(Doc. 21-E at 1–2.)

The parties disagree about the extent to which the Restrictive Housing Policy applies to

Ortega's placement in the RHU. The Restrictive Housing Policy provides in relevant part:

Applicability: All inmates and staff of the New Mexico Corrections Department. . . .

1. Inmates will not be placed in Restrictive Housing for disciplinary or Pre Hearing Detention reasons for more than 30 days, per incident.

2. Inmates placed in temporary Restrictive Housing for the purposes of transfer to another facility will be moved as soon as possible. . . .

4. Restrictive Housing is a temporary placement, *not* a long term program.

5. All Restrictive Housing inmates will require review within 72 hours.

6. Inmates placed in Restrictive Housing or protective custody will have a status review completed by the classification committee or other authorized staff group every seven (7) days for the first (2) two months and at least every thirty (30) days thereafter. . . .

7. Inmates in Restrict Housing will have the opportunity to shave and shower at least three times per week.

8. Inmates in Restrictive Housing will receive a minimum of one hour exercise per day outside tier cells, five days per week, unless security or safety considerations dictate otherwise.

(Doc. 35-1.) The Court will examine these two policies in its analysis.

## II.    Legal Standards and Evidentiary Rulings

### A.      Summary Judgment Standard

"Summary judgment is proper if, viewing the evidence in the light most favorable to the

non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckab*y, 902 F.3d 1136, 1143 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cnty. Sheriff's Off.*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id*. (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id*. at 1107 (quotation and citation omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id*. (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

### B.    Qualified Immunity Standard

The Court reviews summary judgment motions based on a qualified immunity defense somewhat differently. *See Halley*, 902 F.3d at 1144. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "A constitutional right is clearly

6

established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." *Id.* (citation omitted). "Generally, 'existing precedent must have placed the statutory or constitutional question beyond debate' to clearly establish a right." *Id.* (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)). "The question is not whether a 'broad general proposition' was clearly established, but 'whether the violative nature of particular conduct [was] clearly established.'" *Id.* (quoting *Redmond*, 882 F.3d at 935) (quotation marks omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quoting *Koch*, 660 F.3d at 1238). And while the "Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, 'a plaintiff's version of the facts must find support in the record.'" *Koch*, 660 F.3d at 1238 (quoting *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). If the plaintiff's "version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it,' then [the Court] 'should not adopt that version of the facts.'" *Halley*, 902 F.3d at 1144 (quoting *Thomson*, 584 F.3d at 1312).

The Court may address the qualified immunity analysis in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In fact, where a court is "firmly convinced the law is not clearly established" and the "constitutional violation question is so factbound that the decision provides little guidance for future cases[,]" it is prudent to proceed directly to the clearly established prong of the analysis. *See Tanner*, 864 F. Supp. 2d at 1108 (quoting *Kerns v. Bader*, 663 F.3d 1173, 1180–81 (10th Cir. 2011) (quotation marks omitted)).

### C.    Evidentiary Objections and Rulings

Ortega objects to all Lopez's exhibits except Exhibit C, the state court's Safekeeping Order. (*See* Doc. 34 at 1.) The Court will deny as moot Ortega's objections to Exhibits A (a police report), D (an NMCD receipt of state prisoner record), and K (an unofficial log of a state court proceeding), as the documents are not relevant to the Court's analysis.[4]

The Court will overrule Ortega's objections and deny the motion as to Exhibits B, F, G, H, I, J, and L, which are all state court documents. (*See id.* at 5–6.) The Court may take judicial notice of "official court record[s] in a related state court case . . . ." *See Stack v. McCotter*, 79 F. App'x 383, 391 (10th Cir. 2002) (citing Fed. R. Evid. 201; *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)). And although the undersigned has considered the content of several records, the Court will not assume the truth of any matters asserted or decided therein. *See Columbian Fin. Corp. v. Bowman*, 314 F. Supp. 3d 1113, 1119–20 (D. Kan. 2018), *aff'd*, 768 F. App'x 847 (10th Cir. 2019) ("tak[ing] judicial notice of the existence and content of the orders and pleadings submitted and publicly filed and tak[ing] note of the content of what was argued and what was decided" without "assum[ing] the truth or correctness of the matters or facts alleged, asserted, or decided therein") (citing *Kaufman v. Miller*, 2013 WL 4446977, at *2 (10th Cir. Aug. 21, 2013); *Guttman v. Khalsa*, 669 F.3d 1101, 1130 n.5 (10th Cir. 2012)).

The Court will overrule Ortega's objections and deny the motion with respect to Exhibit E, the Safekeeping Policy. (*See* Doc. 34 at 7.) Ortega objects on the basis that the document is not authenticated, is not accompanied by a certification from a records custodian, and because "[i]t is

---

[4] Ortega argues that Exhibit D to Lopez's motion should be stricken because it contains his full date of birth and social security number. (Doc. 34 at 6.) The Court declines to strike the exhibit on this basis but has restricted the exhibit so that only case participants and the Court may access it. Counsel for Lopez should adhere to Federal Rule of Civil Procedure 5.2(a) when filing documents with sensitive information.

unknown whether the policy . . . was in effect at the time [he] was incarcerated[] or had been superseded." (*Id.*) Because it bears the state seal and the signature of the Secretary of Corrections, the report is a self-authenticating public document pursuant to Rule 902(1). *See Trujillo v. Rio Arriba Cnty. ex rel. Rio Arriba Cnty. Sheriff's Dep't*, 319 F.R.D. 571, 587 n.13 (D.N.M. 2016). The Safekeeping Policy reflects that it was revised on June 21, 2017, and reviewed on July 31, 2018, prior to Ortega's stay in the RHU. (*See* Doc. 21-E.) This policy, which is also available on the New Mexico Corrections Department website, does not appear to have been revised since 2017. *See N.M. Corr. Dep't CD-143500–143501*, https://www.cd.nm.gov/wp-content/uploads/ 2021/04/CD-143500.pdf (last visited Jan. 19, 2023) (reflecting a revision date of June 21, 2017). The Court finds that the Safekeeping Policy is proper evidence on summary judgment under the "Public Records" exception to the hearsay rule. *See* Fed. R. Evid. 803(8); *see also, e.g.*, *Chavez v. City of Las Cruces*, No. CV 05-286 RB/LCS, 2006 WL 8443794, at *13 (D.N.M. July 10, 2006) (overruling hearsay objection to city travel policy on the basis that it was a public record under Rule 803(8)).

Because the Court overrules Ortega's objections to Exhibits B, E–J and L, the Court accepts as undisputed those related facts Ortega conceded in his response to Lopez's summary judgment motion. (*See* Doc. 35 at 4 (noting that Ortega reserves objections as stated in his motion to strike and responds to Lopez's undisputed material facts only for purposes of his response brief).)

## IV.    Discussion

Ortega's only remaining count in this lawsuit is a due process claim against Lopez brought under 42 U.S.C. § 1983. (*See* Docs. 10; Am Compl. ¶¶ 106–17.) The Court notes at the outset that the parties' briefing on this matter made the undersigned's job much more difficult. Even given

the opportunity to file supplemental briefs, the parties failed to adequately develop the issues or

support their positions with evidence or citations to relevant authority.[5] The Court gathers from

the briefing that Ortega attempts to assert two due process claims: (1) a procedural due process

claim based on the absence of periodic reviews during his confinement; and (2) a substantive due

process claim based on the conditions of his confinement, including the duration of his stay and

the limitation of his recreational time in the RHU. As the Court explains below, the procedural due

process claim survives summary judgment, but Lopez is entitled to qualified immunity on the

substantive due process claim.

### A.     The procedural due process claim based on lack of periodic reviews survives.

The Court turns first to Ortega's contention that he had a right to periodic reviews of his

placement in the RHU pursuant to the Restrictive Housing Policy. (*See* Am. Compl. ¶¶ 3, 31–33,

108; Doc. 54.) This policy provides that inmates in the RHU are afforded status reviews every

seven days for the first two months and then every 30 days thereafter. (Doc. 35-1 at 4.) Ortega

asserts that he did not receive periodic reviews as required.

Lopez ignores this portion of Ortega's claim in his motion for summary judgment, as well

as Ortega's reliance on the Restrictive Housing Policy, despite Ortega's repeated references to the

policy and/or the lack of periodic reviews in his Complaint and in his response to Lopez's earlier

motion to dismiss. (*See* Am. Compl. ¶¶ 31–33, 38, 63–64, 109; Doc. 5 at 2–3, 11–12.) Even after

Ortega discussed the policy in his response brief, Lopez deigned only to assert, without reference

to affidavit or authority, that the policy is inapplicable to pretrial detainees. (Doc. 44 at 3 ("The

---

[5] For example, Ortega fails to even mention the failure to offer regular reviews under the Restrictive Housing Policy in his response brief. (Doc. 35.) And for his part, Lopez flip flops from his initial briefs to the supplemental brief on whether and how much the Restrictive Housing Policy applies to Ortega's detention and does not elaborate on his change in position or offer an affidavit in support. (*See, e.g.*, Docs. 21; 44 at 3; 52 at 1, 6.)

restrictive housing policy . . . is inapplicable to county hold inmates and . . . [the Safekeeping Policy] is the only policy applicable to the housing of county inmates pursuant to a safekeeping order.").)

Lopez sticks to this theory in his supplemental brief—at least initially. He reiterates that the Restrictive Housing Policy "does not establish or govern timeframes for the housing and management of county jail inmates pursuant to a Safekeeping Order." (Doc. 52 at 1.) He arrives at this conclusion by examining the Restrictive Housing Policy's reference to "inmates in three distinct categories: 1) Restrictive Housing of inmates for disciplinary or Pre Hearing Detention reasons; 2) temporary Restrictive Housing for the purposes of transfer to another facility; and 3) temporary Restrictive Housing for purpose of placement in [the] Special Management Program." (*Id.* (citing Doc. 35-1 at 3).) Because the Restrictive Housing Policy does not specifically reference county jail inmates or safekeeping orders, Lopez argues, it is not intended to establish guidelines for pretrial detainees like Ortega. (*See id.* at 1–2.)

In his next breath, Lopez acknowledges that the Restrictive Housing Policy's guidelines "*are applicable* to county jail inmate[s] housed for safekeeping only with respect to the conditions of the inmate's confinement while in [the] RHU." (*Id.* at 6 (citing Doc. 35-1 at 4) (emphasis added).) That is, Lopez agrees, the Restrictive Housing Policy applies to county jail inmates insofar as it directs that they "will have the opportunity to shave and shower at least three times per week" and "will receive a minimum of one hour exercise per day outside tier cells, five days per week, unless security or safety considerations dictate otherwise." (*Id.* (quoting Doc. 35-1 at 4).) He summarily concludes that the rest of the Restrictive Housing Policy, including its provision requiring periodic status reviews, is inapplicable to county jail inmates. (*See id.*) Lopez submits no affidavit or authority in support of this curious proposition.

11

Ortega responds that because the Safekeeping Policy expressly references the Restrictive Housing Policy, the provisions of both policies apply to county jail inmates. (*See* Doc. 54 at 2.) Section 143501 of the Safekeeping Policy, which Lopez refers to as "the Safekeeping Procedure" (Doc. 52 at 6), states that "[c]ounty jail inmates will abide by the policies and procedures of the receiving institution or those governing Restrictive Housing inmates (*CD-141500*)." (Doc. 21-E at 2.) Ortega notes that this provision contains no specific limitations or exceptions. (Doc. 54 at 2.) As Lopez "has not proffered any policies or procedures other than" these provisions, Ortega contends, "the Restrictive Housing Policy applied to [him]." (*Id.* at 3.)

Additionally, in direct contravention of Lopez's assertion that Ortega did not fall within the three categories of inmates to which the Restrictive Housing Policy applies, Ortega submits evidence to show that the NMCD placed him in the second category—inmates in the RHU "for the purposes of transfer to another facility . . . ." (*See* Doc. 54 at 3.) In its August 23, 2019 report on inmates housed in the RHU, NMCD identified Ortega as an inmate "pending transfer to another facility." (*See* Doc. 54-A.) As the Restrictive Housing Policy explicitly applies to such inmates, the Court finds that Ortega has submitted evidence to demonstrate that he was entitled to periodic reviews.

Lopez's position was premised on the supposition that the Restrictive Housing Policy did not apply to Ortega. He did not argue that clearly established law would not have put him on notice that he would violate Ortega's rights by failing to afford him periodic reviews should the Policy apply. Accordingly, the Court will deny Lopez's motion to the extent that the claim is based on the failure to provide Ortega with periodic reviews under the Restrictive Housing Policy.

### B.     Lopez is entitled to qualified immunity on the substantive due process claim.

Ortega also argues that his conditions of confinement—the duration of his stay and the

minimal recreation time—amounted to punishment in violation of his substantive due process rights. (*See* Doc. 35 at 12–15.) "Due process requires that a pretrial detainee not be punished prior to a lawful conviction." *Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1106 (10th Cir. 2005), *opinion vacated in part on reh'g en banc*, 449 F.3d 1097 (10th Cir. 2006) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Littlefield v. Deland*, 641 F.2d 729, 731 (10th Cir. 1981)). "However, the government may subject those awaiting trial to the conditions and restrictions of incarceration so long as those conditions and restrictions do not amount to punishment." *Id.* (citing *Bell*, 441 U.S. at 536–37).

"The determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some other legitimate government purpose." *Id.* (citing *Bell*, 441 U.S. at 538). An act performed with an intent to punish a pretrial detainee is unconstitutional. *Id.* If there is no intent to punish, "a plaintiff may still prove unconstitutional punishment by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective[,]" *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (citing *Bell*, 441 U.S. at 539), or that "it appears excessive in relation to the alternative purpose assigned[,]" *Bell*, 441 U.S. at 538 (citation omitted). "[R]estraints that 'are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting.'" *Peoples*, 422 F.3d at 1106 (quoting *Bell*, 441 U.S. at 540).

Lopez asserts that Ortega's placement in the RHU was not punitive. (Doc. 21 at 9.) Rather, his placement was made pursuant to NMCD policy that served the legitimate governmental purpose of "housing and management of county jail inmates for safekeeping" before trial. (*Id.* (quoting Doc. 21-E at 1).) The Tenth Circuit has held that "no process is required if [a pretrial

detainee] is placed in segregation not as punishment but for managerial reasons." *Peoples*, 422

F.3d at 1106 (quoting *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002)). Because the undisputed

facts show that the state district court ordered Ortega to be moved to NMDC for housing until his

trial, Lopez argues, Ortega cannot make out a due process violation. (*See* Doc. 21 at 9–11.)

Ortega agrees that he was placed in the RHU pursuant to the Safekeeping Policy, and he

does not allege any intent to punish. (*See* Doc. 35 at 13.) He argues, though, that the Safekeeping

Policy did not require Lopez to *keep* him in the RHU pending trial.[6] (*See id.* at 12–13.) The

Safekeeping Policy states that inmates housed at NMCD pursuant to a safekeeping order would be

"segregate[d] . . . from the general population and place[d] . . . in Restrictive Housing status."

(Doc. 21-E at 2.) Lopez asserts, and the Court agrees, that placement of pretrial detainees in the

RHU reflects legitimate governmental objectives in "'ensuring a detainee's presence at trial,'

security, and the 'need to manage the facility in which the individual is detained.'" (Doc. 21 at 9

(quoting *Bell*, 441 U.S. at 540).) Ortega cites no policy or precedent that specifically governs the

transfer of pretrial detainees from the RHU to another location.[7] (*See* Doc. 35.) Instead, he gestures

vaguely to language in the Restrictive Housing Policy, which states that "Restrictive Housing is a

temporary placement, *not* a long term program." (Doc. 35 at 7 (quoting Doc. 35-1 at 3).) And he

cites exactly one case—*Blackmon*—in the entire argument section of his response brief.

---

[6] Lopez also contends in his reply brief that he bore no discretion for the housing decision because Ortega's segregation was purely at the direction of the state court judge and the district attorney's office. (*See* Doc. 44 at 4, 6 (citing Doc. 44-1).) The Court disagrees. Although the state court issued the Safekeeping Order upon motion of the district attorney's office, it was NMCD's own policy that set the *conditions* of pretrial detainees' housing in the RHU. Lopez's argument on this point is a nonstarter.

[7] Ortega also cites the Court's March 16, 2022 Opinion denying Lopez's motion to dismiss this claim. (Doc. 35 at 15 (citing Doc. 10 at 9).) At that time, the Court had only the benefit of the Complaint, which suggested that Ortega "was only moved from solitary after his story appeared in the Santa Fe New Mexican." (Compl ¶ 57.) Thus, the Court opined that "[i]f Ortega was released from the RHU simply because of the publicity [from the article], it lends credence to his argument that his earlier confinement was arbitrary or purposeless." (Doc. 10 at 9).) The evidence now establishes that Ortega remained in the RHU after the article was published and was released to attend his criminal trial. Consequently, Ortega has not shown that Lopez released him from the RHU only after pressure from the article.

Ortega cites *Blackmon* first for the general proposition that "a plaintiff may . . . prove unconstitutional punishment by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective." (Doc. 35 at 11 (quoting *Blackmon*, 734 F.3d at 1241).) He later cites *Blackmon* to support the assertion that "his continued conditions of confinement imposed by Defendant served as punishment and [were] unrelated to any penological interest." (*Id.* at 13 (citing *Blackmon*, 734 F.3d at 1244).) *Blackmon* is inapposite. In that case, an 11-year-old pretrial detainee at a juvenile detention center alleged that staff members violated his due process rights by restraining him "with the express purpose of punishing him . . . ." *Blackmon*, 734 F.3d at 1239, 1242. The Tenth Circuit found that such restraint, where the child did not pose a threat, did not serve a legitimate penological purpose and was impermissible punishment. *Id.* at 1242. *Blackmon* would not have provided Lopez notice that the conditions of Ortega's confinement under these circumstances would violate his constitutional rights.

Had Ortega's attorney performed a more thorough search of the relevant caselaw, he would have found authority to buttress his argument. The Court begins with *Peoples*, the case on which Lopez hangs his hat. In *Peoples*, the Tenth Circuit found that a pretrial detainee's *initial placement* in segregation did not violate his due process rights because it was not done as punishment, but for managerial reasons. 422 F.3d at 1106. Peoples was *kept* in segregation for 13 months due to "his plot to escape from his previous pretrial detention facility . . . ." *Id.* The Tenth Circuit noted that "[a] substantiated escape threat . . . is a legitimate nonpunitive rationale for Mr. Peoples's continued segregation." *Id. Peoples* is not, therefore, directly on point, as the Safekeeping Order did not specify any underlying reason for Ortega's transfer. Moreover, *Peoples* does not speak to the New Mexico statutory and regulatory scheme at play here, nor to the fact that Ortega's trial date was repeatedly pushed back.

Although the Court has not located any Tenth Circuit authority directly on point, caselaw from other courts tends toward a finding that the conditions of Ortega's confinement were "excessive in relation to the [governmental] purpose assigned." *See Bell*, 441 U.S. at 537–38 (citations omitted). In *Covino v. Vermont Department of Corrections*, a pretrial detainee was held in administrative segregation for nine months. 933 F.2d 128, 129 (2d Cir. 1991). The Second Circuit acknowledged that the initial placement in segregation "violated no protected constitutional right." *Id.* at 130. It went on: "[a]t some point, however, the administrative necessity for involuntary lock-up begins to pale." *Id.* "Indeed, after nine months, it smacks of punishment." *Id.* The Second Circuit directed the district court to analyze whether "state law creates a liberty interest with respect to administrative segregation." *See id. Covino* is not directly on point, however, both because the district court had not examined whether the state enacted statutes or regulations governing administrative segregation and because the pretrial detainee there *asked* to be put into a single cell. *See id.* (noting that the facility staff put him in "the facility's isolation wing" upon his request for a single cell). Here, the parties have submitted evidence of a state statute and NMCD policy on point. Moreover, Ortega was moved to the RHU pursuant to a Safekeeping Order and stayed there for 10.5 months because of numerous trial continuances.

Other courts have relied on *Covino* to deny similar motions. In *DeLeon v. Rockland County Correctional Facility*, for example, the court denied summary judgment in part where a pretrial detainee was held in solitary confinement for seven months. No. 10 Civ. 7536 PGG, 2013 WL 1195623, at *2 (S.D.N.Y. Mar. 22, 2013). The court noted that absent some legitimate purpose, seven months "smacks of punishment." *Id.* at *4 (quoting Covino, 933 F.3d at 130) (citing *Bell*, 441 U.S. at 539 n.20; *United States v. Basciano*, 369 F. Supp. 2d 344, 351 (E.D.N.Y. 2005) (holding that indefinite pre-trial detention in solitary confinement amounts to punishment and

16

ordering pre-trial detainee released into general population)). Unlike the circumstances here, the pretrial detainee in *DeLeon* was placed in solitary confinement because of mental and behavioral issues and an alleged refusal to take medications. *See id* at *5. The court found that there were material issues of fact regarding the detainee's refusal to take medications "and [an] absence of evidence justifying [his] lengthy period in solitary confinement . . . ." *Id.* at *8.

In *Parson v. York*, the court denied a motion to dismiss the complaint of a pretrial detainee who was placed in administrative segregation for disruptive conduct and held for eight months without evidence of review. No. 16-CV-167-DNH-CFH, 2017 WL 1076536, at *4–5 (Feb. 28, 2017), *R&R adopted*, 2017 WL 1066677 (N.D.N.Y. Mar. 21, 2017). The complaint alleged that facility officials "rubber stamped" multiple extensions after the initial placement, and the court found that even if "[t]he reasons for [the detainee's] initial placement in [segregation were] compelling[,]" there was no "indication . . . that [his] assaultive and disruptive behavior continued for eight months, necessitating administrative segregation for that entire time . . . ." *Id.* at *1, 5.

In *Higgs*, the Seventh Circuit held that "no process is required if [a pretrial detainee] is placed in segregation not as punishment but for managerial reasons." 286 F.3d at 438 (citations omitted). The Seventh Circuit later explained in dicta:

> We did not mean to suggest that once the emergency was past, the jail could nevertheless keep the prisoner in segregation indefinitely without providing the procedural safeguards encapsulated in the term "due process" because it was not "punishing" him, if conditions in the segregation unit were so much more restrictive than those in the rest of the jail as to constitute an actionable incremental deprivation of liberty.

*Miller v. Dobier*, 634 F.3d 412, 415 (7th Cir. 2011) (quoting *Higgs*, 286 F.3d at 438); *see also Stevenson v. Carroll*, 495 F.3d 62, 69 (3d Cir. 2007) ("Although pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest

in not being detained indefinitely in the [Security Housing Unit] without explanation or review of their confinement.").

In *Lock v. Jenkins*, "pretrial detainees (commonly known as safekeepers) held pursuant to state statute" alleged that their conditions of confinement—in which they spent the majority of their days in small, single-person cells—violated their due process rights. 641 F.2d 488, 490–93 (7th Cir. 1981). The district court found that the conditions did not violate the detainees' rights. *See id.* at 492. Relying heavily on the decision in *Bell*, the Seventh Circuit disagreed. It noted that in *Bell*, "the Supreme Court found no due process violation in keeping two pretrial detainees in" small cells "for only seven or eight hours daily . . . ." *Id.* (discussing *Bell*, 441 U.S. at 543). The Seventh Circuit emphasized that the *Bell* Court's determination was "buttressed by the detainees' length of stay [in that case,]" most of whom were "released within 60 days." *Id.* at 493 (quoting *Bell*, 441 U.S. at 543). In *Lock*, however, detainees spent 22 hours per day in single-person cells. *Id.* at 422. "The average length of confinement of safekeepers at the prison was two months[,]" though some stayed much longer. *Id.* at 490 n.2. The Seventh Circuit found that the blanket imposition of such restrictive conditions "amount[ed] to punishment of the safekeepers and thus violate[d] their rights to due process because of the great length of time that each safekeeper, regardless of individual needs and circumstances, [was] . . . required to spend in [the] small cell[s] . . . ." *Id.* at 494. The *Lock* Court went on to state that it had "no hesitancy in concluding that confinement of these detainees in a prison maintained primarily for the purpose of punishment of convicted persons, under conditions more burdensome than those imposed on the general population of convicted felons, amounts to punishment under *Bell v. Wolfish*." *Id. Lock* is not completely on point, however, because the Seventh Circuit gave great consideration to the size and conditions of the cells, a factor Ortega has not dedicated any attention to here. *See* 641 F.2d at

493–95.

Finally, in *Williamson v. Stirling*, the Fourth circuit examined a "safekeeper" program regarding the holding of certain pretrial detainees, much like § 33-1-15. *See* 912 F.3d 154, 161 (4th Cir. 2018). A detention center charged with housing detainees promulgated procedures specifying that "safekeeper pretrial detainees will be . . . segregated from other . . . inmates in" a special unit and given "the second-most restrictive of five confinement classifications." *Id.* at 162. Williamson was placed in segregation because of threatening and combative conduct he displayed while awaiting trial. *Id.* at 160–62. Restrictions included solitary confinement, 23- to 24-hour lockdown, showers two or three times per week, no or limited outdoor exercise, and limited access to books and other materials. *Id.* at 162–63. Williamson remained in these segregated conditions for more than three years. *See id.* at 179. The Fourth Circuit found that "[a] reasonable jury could readily find such a response to be excessive—and thus punitive . . . ." *Id. Williamson* is distinguishable from the case here because the decision to place Williamson in solitary confinement was made pursuant to a state executive order, not a court order. *See id.* at 161–62.

Based on the Court's own review of authority from other courts, the undersigned holds that a reasonable jury could find that 10.5 months in a small, solitary cell with only one to two hours per day outside of the cell for recreation and no meaningful human contact "appears excessive in relation to the [stated] purpose[,]" *Bell*, 441 U.S. at 538, that is, to "hous[e] and manag[e] . . . county jail inmates for safekeeping" (Doc. 21-E at 1). Still, although the circumstances here point toward a due process violation, the Court is reluctant to find that "the weight of authority from other courts [has] *clearly* establish[ed this] right." *See Halley*, 902 F.3d at 1144 (emphasis added). As explained above, the cases that the Court found are all factually distinguishable from the circumstances here. Accordingly, although the Court finds that 10.5

months in segregation under these circumstances "smacks of punishment," Lopez is entitled to qualified immunity for the alleged substantive due process violation. Ortega fails to show that clearly established law would have put Lopez on notice that holding a pretrial detainee in the RHU for 10.5 months pursuant to a Safekeeping Order, where the detainee's trial was repeatedly pushed back and where neither statute nor policy spoke to the transfer of detainees from the RHU, would violate his constitutional rights. The Court grants Lopez's motion on this issue.

It appears that Ortega may also contend that Lopez's decision to afford Ortega the minimal amount of recreational time—standing alone—violated his right to due process. (*See* Doc. 35 at 13–14.) Ortega argues that the restriction was arbitrary and unrelated to a legitimate governmental objective, as evidenced by the fact that Lopez increased his rec time after the news article regarding Ortega's incarceration was published. (*See id.*) Yet, the limitation on recreational time for pretrial detainees housed in the RHU is logically connected to the legitimate governmental objective of maintaining order and security in the facility. *See Gee v. Pacheco*, 627 F.3d 1178, 1187–88 (10th Cir. 2010) (noting that "[b]ecause [the applicable caw law] allows prohibitions and restrictions that are reasonably related to legitimate penological interests, [a plaintiff] must include sufficient facts to indicate the plausibility that the actions of which he complains were not reasonably related to legitimate penological interests"). Further, even if the Court were to find that Lopez violated Ortega's constitutional rights by giving him only one hour of recreational time per day (a conclusion which the Court does not draw), Ortega fails to cite authority that would have put Lopez on notice that giving a pretrial detainee the minimum amount of rec time required for inmates in the RHU, standing alone, would violate his rights. Lopez is entitled to qualified immunity on this basis as well.

**THEREFORE,**

**IT IS ORDERED** that Lopez's Motion for Summary Judgment **DENIED IN PART** regarding Ortega's procedural due process claim for failure to afford him periodic reviews; the motion is **GRANTED IN PART** with respect to Ortega's substantive due process claim based on the conditions of his confinement, including the duration of his time in the RHU and his amount of recreational time.

ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE